[Cite as *State ex rel. Pleasant v. Indus. Comm.*, 2017-Ohio-7130.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Keith Pleasant, | : | |
| Relator, | : | |
| v. | : | No.  15AP-637 |
| Industrial Commission of Ohio and City of Columbus, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

D E C I S I O N

Rendered on August 8, 2017

**On brief:** *Law Offices of Thomas Tootle,* and *Thomas Tootle,* for relator.

**On brief:** *Michael DeWine,* Attorney General, and *Patsy A. Thomas,* for respondent Industrial Commission of Ohio.

**On brief:** *Richard C. Pfeiffer, Jr.,* City Attorney, and *Wendy S. Cane,* for respondent City of Columbus.

IN MANDAMUS
ON OBJECTION TO MAGISTRATE'S DECISION

BRUNNER, J.

{¶ 1}   In this original action, relator, Keith Pleasant, requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("the commission"), to specifically state the evidence on which it relied to exercise continuing jurisdiction over two orders issued by commission staff hearing officers ("SHO") on July 23, and October 31, 2014, or,

No. 15AP-637

in the alternative, ordering the commission to reinstate the SHO orders. The July 23, 2014 SHO order had denied that part of a motion filed by the Bureau of Workers' Compensation ("BWC") regarding Pleasant's permanent total disability ("PTD") compensation. The October 31, 2014 SHO order had denied that part of BWC's motion regarding his temporary total disability ("TTD") compensation.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to a magistrate, who issued the appended decision, including findings of fact and conclusions of law. The magistrate found the commission did not abuse its discretion in exercising continuing jurisdiction over the two SHO orders that had denied BWC's motion. The magistrate decided that Pleasant's request for a writ of mandamus should be denied.

{¶ 3} Pleasant timely filed an objection to the magistrate's decision. The commission timely filed its memorandum contra Pleasant's objection. Pleasant's employer at the time of his injury, respondent City of Columbus, also filed a memorandum contra Pleasant's objection.

{¶ 4} Having examined the magistrate's decision, conducted an independent review of the record pursuant to Civ.R. 53, and undertaken due consideration of the objection, we overrule Pleasant's objection and adopt the magistrate's decision, with correction, as our own.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 5} On May 30, 2007, Pleasant sustained an industrial injury to his right shoulder in the course of, and arising out of, his employment with the City of Columbus, Division of Refuse.[1] BWC allowed Pleasant's original claim and subsequently allowed other conditions relating to Pleasant's right shoulder. BWC also allowed the conditions of depressive disorder and dysthymic disorder to be added to Pleasant's claim. Pleasant was awarded TTD compensation through May 26, 2011. He was awarded PTD compensation beginning May 27, 2011, based on medical reports that he was unable to perform sustained remunerative employment.

---

[1] The magistrate's decision, Finding of Fact No. 1, contains a typographical error, stating Pleasant was employed with the City of Columbus's "Division of Refuge," rather than the Division of Refuse.

No. 15AP-637

{¶ 6} On April 25, 2012, BWC's Special Investigations Unit ("SIU") received an allegation that Pleasant was working as a maintenance man. The allegation prompted a two-year investigation culminating in a 19-page report supported by voluminous documentation, which included statements from individuals who had paid Pleasant for work he performed while he was receiving TTD compensation or PTD compensation, hundreds of invoices provided by a company which had paid Pleasant for work, a spread sheet created as part of the SIU investigation, Pleasant's bank records which showed deposits into his account totaling $62,190 from January 11, 2011 to June 2012, his 1099 tax form for tax year 2012, his repeated denials of employment to medical providers, and his certifications on his TTD forms that he was not working. The SIU investigators concluded that Pleasant was gainfully employed by multiple entities during the time he was receiving compensation from BWC, and that he had intentionally concealed his employment in order to continue receiving BWC compensation.

{¶ 7} On April 7, 2014, BWC filed a motion requesting the commission to find an overpayment of TTD compensation from December 30, 2008 through May 26, 2011, to find an overpayment of PTD compensation beginning May 27, 2011, to find fraud relative to the TTD compensation and PTD compensation, and to terminate PTD compensation.

{¶ 8} On July 10, 2014, a commission hearing officer heard BWC's motion. The hearing officer heard all issues relative to the motion and, on July 23, 2014, rendered two separate orders, one in the capacity of a district hearing officer ("DHO") on the fraud, overpayment and continuing jurisdiction issues relative to the TTD compensation, and one in the capacity of an SHO on the fraud, overpayment, termination, and continuing jurisdiction issues relative to the PTD compensation.

{¶ 9} The DHO order issued July 23, 2014 denied that part of BWC's motion regarding TTD compensation, finding that BWC had failed to establish that Pleasant was actually working while receiving TTD compensation from December 30, 2008 through May 26, 2011. The DHO accepted testimony from two individuals who stated they had not actually seen Pleasant working and Pleasant's testimony "that he was merely trying to help some 'out-of-work' guys." (Sept. 3, 2015 Stipulation of Evidence at 9.) The DHO found Pleasant's activities did not constitute "work" which would have made him ineligible for TTD compensation.

{¶ 10}  The SHO order issued July 23, 2014 was based on the same findings as the DHO order. It denied that part of BWC's motion regarding PTD compensation, finding that BWC had failed to establish that Pleasant was actually working while receiving PTD compensation beginning May 27, 2011 through the date of the hearing.  Again relying on testimony that no one had seen Pleasant actually working and Pleasant's own testimony about just helping out some guys, the SHO found that Pleasant's activities did not constitute "work" which would have made him ineligible for PTD compensation.

{¶ 11}  On August 1, 2014, BWC filed a request for reconsideration of the July 23, 2014 SHO order.  BWC asked the commission to exercise its continuing jurisdiction pursuant to R.C. 4123.52, arguing the SHO order contained clear mistakes of fact and a clear mistake of law. On August 26, 2014, the commission issued an interlocutory order granting BWC's request, finding that BWC had "presented evidence of sufficient probative value regarding the alleged presence of a clear mistake of fact in the order from which reconsideration is sought, and a clear mistake of law of such character that remedial action would clearly follow."  (Stipulation of Evidence at 14.)

{¶ 12}  Also on August 1, 2014, BWC appealed the July 23, 2014 DHO order.  An SHO heard that appeal on October 24, 2014.  By order issued October 31, 2014, the SHO affirmed the July 23, 2014 DHO order, finding BWC had not met its burden of proving Pleasant was gainfully employed while he was receiving TTD compensation and had not shown grounds for continuing jurisdiction.

{¶ 13}  BWC appealed the October 31, 2014 SHO order.  Initially, the commission refused to hear the appeal.   However, the commission subsequently issued an interlocutory order sua sponte exercising continuing jurisdiction "based on a probable clear mistake of fact in the [SHO] order, issued October 31, 2014, and a probable clear mistake of law of such character that remedial action would clearly follow."  (Stipulation of Evidence at 22.)  The commission found BWC's appeal of the October 31, 2014 SHO order was closely related to the issues raised in BWC's request for reconsideration of the July 23, 2014 SHO order.  The commission concluded it was arguable the SHO who issued the October 31, 2014 order had erred in finding Pleasant had not kept "any of the money received for the work performed for the alleged employers and in finding [Pleasant's] actions as an alleged 'go-between' did not constitute work activities so as to

preclude entitlement to temporary total disability compensation." *Id.* By a unanimous vote, the commission ordered BWC's appeal from the October 31, 2014 SHO order and the request for consideration of the July 23, 2014 SHO order be heard together before the commission.

{¶ 14} The commission heard both matters on February 5, 2015, and issued two separate orders on May 7, 2015. One order exercised continuing jurisdiction over BWC's request for reconsideration of the July 23, 2014 SHO order and granted that part of BWC's motion regarding PTD compensation. The commission decided BWC had met its burden of proving the July 23, 2014 SHO order contained a clear mistake of fact from which reconsideration was sought. The commission specifically found the SHO erred when she found Pleasant did not keep money paid to him by individuals and did not physically perform any work activities. The magistrate's decision quotes the following passage in which the commission explained its finding:

> With hundreds of invoices and checks addressed to [Pleasant] and no persuasive evidence [Pleasant] paid others to do the work, the Commission finds [Pleasant] was working while receiving [PTD] compensation. Therefore, [the commission] exercises continuing jurisdiction pursuant to R.C. 4123.52 and State ex rel. Nicholls v. Indus. Comm., 81 Ohio St.3d 454, 692 N.E. 2d 188 (1998), State ex rel. Foster v. Indus. Comm., 85 Ohio St. 3d 320. 707 N.E. 2d 1122 (1999), and State ex rel. Gobich v. Indus. Comm., 103 Ohio St.3d 585, 2004-Ohio-5990, 817 N.E. 2d 398, in order to correct the error.

(Stipulation of Evidence at 25-26.)

{¶ 15} The commission further explained that its finding that Pleasant had worked while receiving PTD compensation was supported by statements from individuals who had paid Pleasant for work he performed, invoices from one of those individuals, bank records, Pleasant's 2012 tax forms, and a spread sheet created by a BWC SIU investigator. Moreover, the commission found insufficient persuasive evidence Pleasant hired and paid others to do the work listed on the invoices. The commission concluded "the evidence overwhelmingly supports the conclusion [Pleasant] was working, and his testimony to the contrary is not credible." (Stipulation of Evidence at 26.)

No. 15AP-637

{¶ 16} Additionally, the commission's order with respect to the July 23, 2014 SHO order discussed the six prima facie elements of fraud. Applying those elements to the evidence that had been presented at the staff-level hearing, the commission found "reliable, probative, and substantial evidence [Pleasant] knowingly used deception to obtain [PTD] compensation." *Id.*

{¶ 17} The other order issued May 7, 2015 exercised continuing jurisdiction over the October 24, 2014 SHO order that denied that part of BWC's motion concerning Pleasant's TTD compensation. The commission found Pleasant worked while receiving TTD compensation, relying again on evidence presented in the form of statements from individuals who had paid Pleasant for work he performed, invoices from one of those individuals, bank records, Pleasant's 2012 tax forms, and a spread sheet created by a BWC SIU investigator. The commission again found insufficient persuasive evidence that Pleasant hired and paid others to do the work listed on the invoices. This commission order also concluded "the evidence overwhelmingly supports the conclusion [Pleasant] was working, and his testimony to the contrary is not credible." (Stipulation of Evidence at 30.)

{¶ 18} Pleasant filed this mandamus action on July 2, 2015, arguing the commission abused its discretion in exercising continuing jurisdiction over the two SHO orders and requesting a writ ordering the commission to specifically state the evidence on which it relied to exercise continuing jurisdiction or, alternatively, to reinstate both SHO orders.

{¶ 19} The magistrate found the commission did not abuse its discretion by exercising jurisdiction over the two SHO orders. The magistrate therefore decided this Court should deny Pleasant's request for a writ of mandamus.

## II. OBJECTION TO MAGISTRATE'S DECISION

{¶ 20} Pleasant presents a sole objection to the magistrate's decision:

> The Industrial Commission did not have a proper basis to exercise continuing jurisdiction. The Magistrate's Decision finding otherwise is in error.

No. 15AP-637

## III.  DISCUSSION

{¶ 21}  To be entitled to relief in mandamus, Pleasant must establish that he has a clear legal right to relief, that the commission has a clear legal duty to provide such relief, and that he has no plain and adequate remedy in the ordinary course of law.  *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).  To do this, Pleasant must demonstrate that the commission abused its discretion and, "in this context, abuse of discretion has been repeatedly defined as a showing that the commission's decision was rendered without some evidence to support it."  *State ex rel. Burley v. Coil Packing, Inc.*, 31 Ohio St.3d 18, 20 (1987).  To be successful in this mandamus action, Pleasant must show that the commission's decision is not supported by some evidence in the record.  *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986).  Conversely, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion, and mandamus is not appropriate.  *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987).  Credibility and the weight to be given evidence are clearly within the discretion of the commission as the fact finder.  *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 22}  At issue in this matter is whether the commission abused its discretion by exercising continuing jurisdiction over the SHO orders issued July 23, and October 31, 2014.  The magistrate found the commission did not abuse its discretion in doing so. We agree.

{¶ 23}  Pleasant's position on appeal is that the commission should defer to its hearing officers who heard and weighed the evidence and issued orders finding in his favor, and the magistrate erred in finding otherwise.  He contends both SHO decisions were legitimate interpretation of the evidence, rendering the commission's exercise of continuing jurisdiction over the SHO orders improper.

{¶ 24}  The magistrate's decision contains a review of the case law regarding PTD compensation, TTD compensation, and the commission's exercise of continuing jurisdiction.  The magistrate correctly states that the commission's exercise of continuing jurisdiction is not unlimited.  One or more specific prerequisites must exist for the commission to invoke continuing jurisdiction: new and changed circumstances, fraud, clear mistake of fact, clear mistake of law, or error by an inferior tribunal.  *State ex rel.*

*Royal v. Indus. Comm.*, 95 Ohio St.3d 97 (2002). Moreover, the presence of one of these prerequisites must be clearly identified and explained in a commission order seeking to exercise continuing jurisdiction. *State ex rel. Gobich v. Indus. Comm.*, 103 Ohio St.3d 585, 2004-Ohio-5990, ¶ 15.

{¶ 25} Applying this standard to the facts presented here, the magistrate determined the commission had properly invoked continuing jurisdiction by identifying in its orders resulting from the February 5, 2015 hearing the prerequisite of clear mistake of fact in the SHO orders, and by providing explanations of its findings.

## A. July 23, 2014 SHO Order as to PTD Compensation

{¶ 26} The magistrate determined the commission's order resulting from the February 5, 2015 hearing demonstrates that the commission invoked the prerequisite of clear mistake of fact and that it explained its finding. The magistrate in his decision states:

> The February 5, 2015 commission order identifies and explains that the SHO's order "contains a clear mistake of fact" which is that the SHO erred when she found that relator "did not physically perform any of the work activities." The February 5, 2015 commission order declares a clear mistake of fact because the SHO's finding is counter to the "hundreds of invoices and checks addressed to the Injured Worker and no persuasive evidence the Injured Worker paid others to do the work."

(App'x at ¶ 111.) The magistrate notes in his decision that the commission's order refers to "the volume of documentation supporting a finding that [Pleasant] himself physically performed much of the work documented by the invoices and checks." (App'x at ¶ 112.)

{¶ 27} The magistrate addressed Pleasant's assertion that there was no mistake of fact, only an evidentiary disagreement between the SHO and the commission. The magistrate found Pleasant's argument unpersuasive. The magistrate states in his decision that the commission's finding was not merely about the number of documents, but the fact that they contained a large amount of the information that was contrary to the SHO's decision. The magistrate concluded the SHO's order issued July 23, 2014 contained a clear mistake of fact on which the commission appropriately based the exercise of its continuing jurisdiction.

{¶ 28} This Court agrees. The evidence before the hearing officers included a significant amount of documentation that Pleasant was capable of, and was performing, sustained remunerative employment, and thus was not entitled to PTD compensation. The magistrate appropriately determined that "[t]he February 5, 2015 commission order identifies and explains that the [July 23, 2014] SHO's order 'contains a clear mistake of fact' which is that the SHO erred when she found that [Pleasant] 'did not physically perform any of the work activities.' " (App'x at ¶ 111.)

{¶ 29} We find the commission did not abuse its discretion by exercising continuing jurisdiction to remedy a clear mistake of fact which was identified and explained in the commission's order as to the SHO order issued July 23, 2014.

### B. October 31, 2014 SHO Order as to TTD Compensation

{¶ 30} Likewise, the magistrate did not err in holding the commission did not abuse its discretion in exercising continuing jurisdiction over the October 31, 2014 SHO order regarding TTD compensation. The magistrate found that, although this commission order did not directly assert a clear mistake of fact or a clear mistake of law, the commission[2] stated "[t]he evidence overwhelmingly supports the conclusion [Pleasant] was working, and his testimony to the contrary is not credible." (App'x at ¶ 124, quoting Stipulation of Evidence at 30.) The magistrate also discussed the portion of the commission's order addressing fraud.

{¶ 31} An examination of the commission's order as to TTD compensation shows the commission found TTD compensation was overpaid from December 30, 2008 to May 26, 2011, and that Pleasant committed fraud. The commission's order provided an explanation of its finding that Pleasant worked while receiving TTD compensation, resulting in the overpayment. The commission's order also identified fraud as a condition for exercising continuing jurisdiction and provided a thorough explanation of that finding.

{¶ 32} We find the commission did not abuse its discretion by exercising continuing jurisdiction to remedy a clear mistake of fact and fraud, which were identified and explained in the commission's order as to the SHO order issued October 31, 2014.

---

[2] The magistrate's decision attached at paragraph 124 erroneously attributes this statement to the SHO. The statement is contained in the commission's order issued May 7, 2015.

## IV. CONCLUSION

{¶ 33} Upon review of the magistrate's decision, an independent review of the record according to Civ.R. 53, and giving due consideration to Pleasant's objection, we find the magistrate has properly stated the pertinent facts and applied the appropriate law. Therefore, we overrule Pleasant's objection to the magistrate's decision and adopt the decision as our own with corrections.  In accordance with the magistrate's decision, the requested writ of mandamus is denied.

*Objection overruled;*
*writ of mandamus denied.*

BROWN and KLATT, JJ., concur.

———————————

No. 15AP-637

<u>APPENDIX</u>

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Keith Pleasant, | : | |
| Relator, | : | |
| v. | : | No. 15AP-637 |
| Industrial Commission of Ohio and City of Columbus, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

M A G I S T R A T E ' S  D E C I S I O N

Rendered on May 5, 2016

*Law Offices of Thomas Tootle,* and *Thomas Tootle,* for relator.

*Michael DeWine,* Attorney General, and *Patsy A. Thomas,* for respondent Industrial Commission of Ohio.

*Richard C. Pfeiffer, Jr.,* City Attorney, and *Wendy S. Cane,* for respondent City of Columbus.

IN MANDAMUS

{¶ 34} On April 7, 2014, the Bureau of Workers' Compensation ("bureau") filed a motion against relator, Keith Pleasant, in his industrial claim. The bureau sought declarations of overpayments of temporary total disability ("TTD") and permanent total disability ("PTD") compensation, and that the compensation was fraudulently obtained. The bureau also sought termination of PTD compensation.

{¶ 35} In this original action, relator requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate two of its orders resulting from a February 5, 2015 commission hearing. One of the orders exercises continuing jurisdiction over an October 24, 2014 order of a staff hearing officer ("SHO") that denied that part of the bureau's motion regarding TTD compensation. The other commission order exercises continuing jurisdiction over a July 10, 2014 order of an SHO that had denied that part of the bureau's motion regarding PTD compensation.

{¶ 36} Relator requests that the writ order the commission to reinstate the October 24 and July 10, 2014 SHO orders such that the bureau's April 7, 2014 motion is denied in its entirety.

Findings of Fact:

{¶ 37} 1. On May 30, 2007, relator injured his right shoulder while employed with the City of Columbus, Division of Refuge. The injury occurred when he lifted a plastic container with his right upper extremity. The industrial claim (No. 07-343258) is allowed for multiple conditions of the right shoulder and cervical area. It is also allowed for a dysthymic disorder.

{¶ 38} 2. Relator has undergone two surgeries to the right shoulder.

{¶ 39} 3. As early as December 30, 2008, relator began receiving TTD compensation. TTD compensation was paid through May 26, 2011.

{¶ 40} 4. On June 20, 2011, relator filed an application for PTD compensation.

{¶ 41} 5. Following a March 12, 2012 hearing, an SHO issued an order awarding PTD compensation beginning May 27, 2011. The SHO relied on a May 27, 2011 report from Nancy Renneker, M.D., a June 1, 2011 report from psychologist Lee Howard, Ph.D., and a November 28, 2011 report from psychologist John M. Malinky, Ph.D. The SHO determined that relator was unable to perform any sustained remunerative employment solely as a result of the medical impairment caused by the allowed conditions of the claim. The SHO did not find it necessary to consider the non-medical disability factors in awarding PTD compensation.

{¶ 42} 6. On April 25, 2012, the bureau's Special Investigations Unit ("SIU") received an allegation from an anonymous source that relator was working as a

No. 15AP-637

"maintenance man."  The allegation prompted an SIU investigation that was performed by Special Agent Norman McCloskey and Fraud Analyst Shawn Miller.  About two years later, on March 4, 2014, McCloskey and Miller issued a 19-page report of investigation in which they concluded that relator had been gainfully employed by Environmental Management Services ("EMS") and Mark Wehinger during the time he was receiving compensation from the bureau.  They also concluded that relator intentionally concealed his employment in order to continue receiving compensation from the bureau.

{¶ 43} 7.  According to the SIU report, in early June 2013, McCloskey learned that relator's workers' compensation benefits were electronically deposited into his checking account with JP Morgan Chase Bank ("Chase Bank").

{¶ 44} 8.  McCloskey issued a subpoena for relator's Chase Bank account records.

{¶ 45} 9.  In late June 2013, McCloskey reviewed the Chase Bank records.  He found 50 unidentified deposits into the Chase Bank accounts totaling $62,190 for the period January 11, 2011 to June 2012.  A subsequent subpoena was issued for the deposit information.

{¶ 46} 10.  According to the SIU report, in late July, McCloskey received the requested line item deposit information from Chase Bank.  The majority of the deposits were from Wehinger V, Ltd., and EMS.  Two additional deposits were noted:  one from Jeffrey and Patti Mortensen dated October 7, 2011, and another from Robert and Janise Kowalski dated October 1, 2011.

{¶ 47} 11.  According to the SIU report, on July 27, 2012, McCloskey interviewed Patti Mortensen at her residence.  In the SIU report, McCloskey describes the interview:

> Mortensen stated she hired PLEASANT to paint the trim of her residence. Mortensen stated PLEASANT had a helper when she hired him for the job. She stated the work was completed from October 5, 2011, to October 7, 2011. Mortensen stated she worked third shift and was asleep when the work was completed. Mortensen stated she did not witness the work being completed. Mortensen was shown a photo of PLEASANT and she identified him as the person she hired and paid to paint the trim of her residence.

No. 15AP-637

{¶ 48} Chase Bank records show that relator deposited into his account a check from Jeffrey and Patti Mortensen in the amount of $1,200. The bank posting date is October 11, 2011.

{¶ 49} 12. According to the SIU report, on September 27, 2012, McCloskey and Criminal Investigator Cindy Berry interviewed Janise Kowalski at her residence. In the SIU report, McCloskey describes the interview:

> Kowalski explained that her husband, Bob Kowalski was appointed by the Court to a receivership for an apartment complex. She stated the bank handling the apartments hired EMS to gut the complex. Kowalski stated EMS contacted PLEASANT to perform this work. Kowalski stated thru their relationship with EMS, she and her husband hired PLEASANT to remove some carpet from a home they had recently purchased. Kowalski stated PLEASANT and his brother performed this work. Kowalski stated along with removing the carpet, PLEASANT and his brother hauled a large freezer out of the garage.
>
> Kowalski provided to McCloskey the invoice that PLEASANT provided to her for the work. Kowalski was shown a photo of PLEASANT and she identified him as the person whom she hired.

{¶ 50} Chase Bank records show that relator deposited into his account a check from Robert and Janise Kowalski in the amount of $400. The bank posting date is October 14, 2011.

{¶ 51} Attachment 3 to the SIU report contains a hand-written statement signed by Janise Kowalski on September 27, 2012. Below a photograph, the statement reads:

> This is the person who I hired to remove carpet, broom clean house & remove several appliances from my home * * *.

{¶ 52} 13. According to the SIU report, in October 2012, McCloskey and Special Agent John Koehl travelled to EMS to meet Wehinger. Upon arrival, they were advised that Wehinger was out of the country. However, McCloskey and Koehl met with Chief Financial Officer Tonya Adams instead. At that time, Adams was served with a subpoena. Adams stated she would gather the requested EMS records and call SIU when the records were ready.

{¶ 53} 14. In early November 2012, Adams called McCloskey to inform him that the records were ready for pick-up. McCloskey travelled to EMS to meet with Adams and to pick-up the records. According to the SIU report, Adams informed McCloskey that relator had been performing "spot labor and maintenance repairs for EMS, Wehinger IV and Wehinger V since 2011."

{¶ 54} According to the SIU report, Adams stated that Wehinger IV, and Wehinger V were companies created to manage rental properties owned by Wehinger. Adams stated that relator "would do the clean outs and repairs on rental properties when needed." If an existing tenant needed a repair, the tenant would call relator instead of Wehinger to perform repairs.

{¶ 55} According to the SIU report, Adams stated that all the work relator completed for EMS would have been labor on foreclosed properties owned by Commerce National Bank. When Commerce National Bank foreclosed on a property, EMS was called to perform the "clean-out/clean-up and rehab work."

{¶ 56} According to the SIU report, the records provided by Adams included approximately 260 invoices, requests for reimbursement for purchased supplies, and copies of checks. The earliest dated invoice was noted to have been paid on December 30, 2008. That invoice was a record of Wehinger IV, Ltd., in the amount of $60. The service was noted as "repair to house" at a stated address, and a notation indicating that the invoice was paid with check No. 1494. The invoice instructed that all checks be made payable to "Keith Pleasant." The most recent invoice included in the records was dated September 20, 2012, and the most recent request for reimbursement for supplies provided was dated October 12, 2012. The copies of checks included with the records were made payable to relator and corresponded with work invoices submitted between April 2011 and September 2012. All the checks were written on accounts held at Commerce National Bank.

{¶ 57} 15. McCloskey then issued a subpoena to Commerce National Bank requesting the checks noted on the invoices prior to April 2011. The checks, written from the accounts held by Wehinger and dated between December 30, 2008 and April 1, 2011, were forwarded to McCloskey.

No. 15AP-637

{¶ 58} 16. According to the SIU report, on May 27, 2013, McCloskey interviewed Wehinger. McCloskey summarized the interview in his report:

> McCloskey traveled to EMS for a pre-arranged interview with Wehinger. Wehinger was asked to explain his relationship with PLEASANT. Wehinger stated that PLEASANT was a renter of one of his properties. Wehinger stated that he got to know PLEASANT through this rental relationship. Wehinger stated he approached PLEASANT originally about collecting rent for him so that he (Wehinger) would not have to travel 45 minutes to do so. Wehinger stated he offered PLEASANT $25.00 to collect the rent. Wehinger stated another reason he offered this to PLEASANT was because he knew PLEASANT was not doing anything at the time. Wehinger stated he knew that PLEASANT used to drive a trash truck but at the time was out of work.
>
> Wehinger stated his renters would call him when small things would need fixed; for example leaking faucets, broken door hinges, etc., small maintenance work. Wehinger stated he approached PLEASANT about doing this type of work for him, and PLEASANT stated he could perform the work. Wehinger stated that progressed into PLEASANT performing almost all of the maintenance work on his rental properties. Wehinger stated PLEASANT would submit work orders listing the material and labor costs for the work; and he or the company would write checks to pay PLEASANT.
>
> Wehinger stated the maintenance work progressed to bigger jobs. Wehinger stated, for example, he would tell PLEASANT that he had a property that might need a new roof; and PLEASANT would say that he "knew people who could perform this type of work." Wehinger stated PLEASANT would get the work completed and submit a work order for the job.
>
> Wehinger stated the work escalated to bigger projects like rehabbing properties and assisting on bank foreclosures for rehab. Wehinger stated some of these jobs were through Commerce National Bank. Wehinger stated that a sales rep with his company by the name of Kris Miller was involved with coordinating the jobs for Commerce National Bank. Wehinger stated PLEASANT worked on some of these jobs.

Wehinger was asked if he ever observed PLEASANT performing any of the work activity. Wehinger stated he observed PLEASANT at the properties but never saw PLEASANT performing any work. Wehinger stated he was not at the properties long enough to observe any work. He stated he would just stop in and check on the progress.

{¶ 59} 17. According to the SIU report, on April 2, 2013, McCloskey and Special Agent John Kenney interviewed EMS Account Manager Kris Miller. In his report, McCloskey summarizes the Miller interview:

K. Miller was asked to explain his involvement with PLEASANT. K. Miller stated he was involved with PLEASANT on three projects that EMS was involved with. K. Miller stated the projects were from receiverships appointed by Commerce National Bank. K. Miller stated they would contract PLEASANT and his helpers (usually his son and another person) to perform basic cleanouts and cleaning. K. Miller stated he would call PLEASANT about a job and/or meet him on the work site to explain what was needed. K. Miller stated he never observed PLEASANT perform any work. Once he explained to PLEASANT what needed to be done on the project, he would leave the work site and therefore never observed any of the work being done.

K. Miller stated one of the projects was an apartment complex on Oakland Park. K. Miller stated he had PLEASANT haul out the furniture, wipe down the walls and board up the windows. Another project was a closed Daycare Center in Heath. K. Miller stated he had PLEASANT clean the floors and wet mop. K. Miller stated the third project was a closed Daycare Center in Pataskala and PLEASANT cleaned the floors at this location.

K. Miller stated he met PLEASANT [a] few times at Home Depot to pay for supplies; and again stated he never observed PLEASANT or any other people perform the requested work. However, [K. Miller] did confirm the work was completed.

K. Miller was asked how a price was determined for the work that was completed. K. Miller stated PLEASANT would always provide an informal estimate. He stated he never received one in writing.

No. 15AP-637

> K. Miller was asked if he was aware of any work that PLEASANT did at the rental properties owned by Wehinger; and Miller stated he was not. He stated he was only aware of the work involving Commerce Bank.

{¶ 60} 18. In early April 2013, McCloskey obtained from EMS copies of 1099's issued to relator for wages earned in 2012. Three 1099's were issued to relator for 2012 as follows:

> Wehinger IV for total earnings of $18,821.21
> Wehinger V for total earnings of $14,028.37
> Environmental Management Services, Inc. for total earnings of $3,656.35

{¶ 61} 19. According to the SIU report, on July 30, 2013, McCloskey and Kenney interviewed relator at his residence. According to the report, the interview went as follows:

> McCloskey explained to PLEASANT that the agents wanted to talk to him about money he had received from Wehinger and EMS.
>
> PLEASANT stated in 2009 or 2010 he rented a house from Wehinger * * *. One day Wehinger stopped by and approached him about doing maintenance work on his (Wehinger's) other rental properties. PLEASANT stated he (PLEASANT) offered to get people that could perform the work. PLEASANT stated from that point forward, Wehinger would call him about maintenance that needed to be done. PLEASANT would then drive to the EMS office and pick up work orders. He stated he would call the guys he thought could perform the work, usually Roland Pleasant and Stevie Grant. PLEASANT stated he would meet these guys at the job site and they would provide him with an estimate of how much it would cost to complete the work. PLEASANT also stated there were times when he would drive Roland Pleasant and Stevie Grant to the job sites. PLEASANT stated he would provide the estimate and the work order to Wehinger who would then write him a check. PLEASANT stated he would either go to Wehinger's bank, cash the check, and then pay the workers; or he would deposit the check into his own bank account and then take out cash to pay the workers. PLEASANT stated he never performed any work himself.

> PLEASANT was asked why EMS would issue him 1099's [sic] if he never performed any work. PLEASANT stated he was upset at them for issuing the 1099's [sic] because they knew he never performed any work.
>
> PLEASANT was asked about a job that was performed for Janice [sic] and Bob Kowalski in Pataskala. PLEASANT stated he remembered the job. PLEASANT was asked if he performed any of the work at this job, and he stated he did not. It was explained to PLEASANT that Janice [sic] Kowalski stated she witnessed him perform work. That she observed him ripping out carpet and carrying items to his truck. PLEASANT stated he did not perform any work. PLEASANT stated he has very little use of his right arm and cannot work.
>
> PLEASANT stated he was in the process of purchasing his current residence from Wehinger on a Land Contract. PLEASANT stated there had been times when he was short on the monthly payment and Wehinger would knock off some of the payment to help him out.
> It was explained to PLEASANT the SIU had also received an allegation that he had opened a car detail shop. PLEASANT stated in October of 2012, he and his father-in-law leased a building on [a] 6 month contract and attempted to open a car detail business. He stated the lease was $500.00 per month; and they were never able to get any business so they shut the business down. PLEASANT stated another reason he shut it down was because someone told him he could not own a business and receive disability at the same time.
>
> PLEASANT was asked if he knew he was not allowed to work and receive disability at the same time. PLEASANT confirms he knew he is not allowed to.
>
> PLEASANT was asked again if he performed any work for Wehinger. PLEASANT stated he did not perform any of the work, he just arranged to get the work done and distributed the funds.

{¶ 62} 20. According to the SIU report, on August 9, 2013, McCloskey interviewed Steven Grant, Sr., over the phone. According to the SIU report, the interview went as follows:

Grant was asked what his working relationship was with PLEASANT. Grant stated he used to work for PLEASANT, but then changed his statement to PLEASANT was a middle man. Grant stated PLEASANT would call him with a job for a man he knew who owned properties. Grant stated PLEASANT would call him about the job and he (Grant) would provide PLEASANT with an estimate to complete the job. Grant stated he would give PLEASANT the price and PLEASANT would fill out the paperwork to get paid. Grant stated he performed the work and that PLEASANT never did any of the work.

Grant was asked how he was paid for the work. Grant stated PLEASANT would sometimes give him a check, but 99% of the time he was paid in cash. Grant was asked how payments for jobs were split up, and Grant stated he didn't know they were split up. He stated he always received the price of his estimate. Grant was asked if he knew if PLEASANT ever kept any of the money. Grant stated as far as he knew, PLEASANT never kept any of the money.

Grant was asked if he ever worked with Roland Pleasant on any of the jobs. Grant stated Roland worked before he did. He stated he only worked a couple of jobs with Roland. Grant was asked if he worked with anyone else. Grant stated sometimes PLEASANT'S son would help out with jobs and also PLEASANT's cousin. Grant stated they had a few friends who would work sometimes also.
Grant was asked again if PLEASANT ever kept any of the money. Grant stated again that as far as he knew PLEASANT never kept any of the money.

{¶ 63} 21. According to the SIU report, Fraud Analyst Miller obtained 23 C-84 forms that were signed by relator from September 7, 2007 to February 21, 2012 and submitted to the bureau to support requests for TTD compensation.

{¶ 64} According to the SIU report, relator answered "No" to question four on all the C-84 forms submitted. Question four asks: "Have you worked, in any capacity, (including full-time, part-time, self-employed or commission work) during the disability period shown above?"

{¶ 65} The C-84s were signed just below the following language:

*I understand that I am not permitted to work while receiving temporary total compensation. I have answered*

No. 15AP-637

*the foregoing questions truthfully and completely. I am aware that any person who knowingly makes a false statement, misrepresentation, concealment of fact or any other act of fraud to obtain compensation as provided by the BWC or who knowingly accepts compensation to which that person is not entitled is subject to felony criminal prosecution and may, under appropriate criminal provisions, be punished by fine or imprisonment or both.*

(Emphasis sic.)

{¶ 66} 22. According to the SIU report:

A PTD Annual Contact letter was mailed to PLEASANT on 6/17/13. The letter requested the receiver answer the questions listed and return the form to BWC. PLEASANT answered the question, "Are you working or have you worked since being granted PTD benefits?" by circling "NO." PLEASANT signed and dated the letter on 6/28/13 just below the statement, "I certify the information provided above is accurate."

**This was noted as significant as PTD benefits were granted at hearing 3/12/12. Between 3/12/12 and 10/12/12, PLEASANT received 48 checks from EMS and Wehinger totaling $28,902.58.

(Emphasis sic.)

{¶ 67} 23. The SIU report also extensively reviews the medical reports of record. In those reports, the authoring doctors indicate that relator portrayed himself as being physically unable to work.

{¶ 68} 24. The SIU report concludes:

The SIU's investigation confirmed PLEASANT was gainfully employed with Enviromental [sic] Management Services and Mark Wehinger. Evidence obtained during the course of the investigation revealed PLEASANT intentionally misrepresented and withheld his employment in order to collect BWC benefits. Further, PLEASANT only ceased working when learning of the SIU's investigation and not because of his inability to do so due to his industrial injury which occurred 5/30/07.

{¶ 69} 25. On April 7, 2014, as previously noted, the bureau filed a motion against relator in his industrial claim. The motion requested that the commission declare an

overpayment of TTD compensation for the period beginning December 30, 2008 through May 26, 2011 and that the TTD compensation was fraudulently obtained. The motion further requested that the commission declare an overpayment of PTD compensation beginning May 27, 2011 and that the PTD compensation was fraudulently obtained. The motion also requested that PTD compensation be terminated.

{¶ 70} 26. It can be noted that, pursuant to R.C. 4121.35, SHO's have original jurisdiction to hear and decide applications for PTD awards. Also, pursuant to R.C. 4121.35, SHO's have jurisdiction to hear and decide appeals from an order of a district hearing officer ("DHO"). Pursuant to R.C. 4121.34, DHO's have original jurisdiction over all contested claims matters except those matters over which SHO's have original jurisdiction.

{¶ 71} 27. Given R.C. 4121.34 and 4121.35, a DHO had original jurisdiction over that part of the bureau's motion regarding TTD compensation, while an SHO had original jurisdiction over that part of the bureau's motion regarding PTD compensation.

{¶ 72} 28. Accordingly, on July 10, 2014, the bureau's motion was initially heard by a hearing officer sitting as both a DHO and SHO. Following the hearing, Hearing Officer K. Sampson issued two orders that were mailed July 23, 2014. In one order, Sampson, sitting as a DHO, denied that part of the bureau's order regarding TTD compensation. In the other order, Sampson, sitting as an SHO, denied that part of the bureau's order regarding PTD compensation.

{¶ 73} 29. The SHO's order of July 10, 2014 (mailed July 23, 2014) regarding PTD compensation explains the denial of the bureau's motion as follows:

> It is the finding of the Staff Hearing Officer that the Injured Worker was paid permanent total disability compensation from 05/27/2011 through 07/10/2014, pursuant to his request for the payment of permanent total disability compensation, and the Staff Hearing Officer order issued 03/29/2012.
>
> The Bureau of Workers' Compensation has alleged the Injured Worker was employed during the period from 12/30/2008 through 05/26/2011, while collecting temporary total disability compensation, and from 05/27/2011 to the present, while collecting permanent total disability compensation.

Mark Wehinger, the owner of companies from which checks were issued in the Injured Worker's name, testified that he never saw the Injured Worker perform any physical labor. Further, Wehinger testified that the Injured Worker "had some guys" the Injured Worker called to do work for Wehinger's properties when the Injured Worker was told of work projects. The Injured Worker testified that when he knew of work projects, he would call "guys" he knew who could do the work and wanted to make some money. The Injured Worker stated that he submitted the invoices to the company for the work performed, and because most of the actual workers did not have bank accounts, he would cash the checks and pay the workers cash. The Injured Worker also submitted receipts for supplies, and would be reimbursed when he pre-paid the expenses. The Injured Worker testified that he did not perform any physical work and did not keep any of the money. He testified that he wanted to save the workers the charges they would have had to pay in order to cash a check through a check cashing company, so he ran the checks through his bank account.

Steven C. Grant, Sr., testified that he performed work for Wehinger's companies, and received the information regarding each job from the Injured Worker. Grant stated he would tell the Injured Worker the cost of the job, the Injured Worker submitted the information to the company, and Grant was paid cash, "almost always," for the job performed at the actual cost he had quoted. Grant also stated the Injured Worker did not perform any physical labor, and that there were other "guys" who did work, or worked with him, if he needed a helper. Grant stated that the Injured Worker was just trying to help out guys who needed a job, and so, the Injured Worker passed the work information on to them. Per Grant, he was not aware of the Injured Worker keeping any of the money for any of the jobs and work performed. Grant stated the economy was so bad, there was a high unemployment rate in the neighborhood, and many of the guys who worked were just hanging around with nothing to do. Also, most of the workers did not have bank accounts in order to cash a check, so the Injured Worker just cashed the checks since he had a bank account. The Injured Worker paid the Wehinger funds to the workers who did the work.

The Staff Hearing Officer has reviewed the extensive banking records, and all the evidence included with the Bureau of

No. 15AP-637

Workers' Compensation motion and Report of Investigation, dated 03/04/2014, as well as the evidence in the claim file. Absent witness evidence, signed by the witness, supporting the Bureau of Workers' Compensation allegation that the Injured Worker was actually working, and the testimony of the Injured Worker that he was merely trying to help some "out-of-work guys" in his area get some work and earn some money, the Staff Hearing Officer finds the Bureau of Workers' Compensation has failed to establish the Injured Worker was working while receiving permanent total disability compensation beginning 05/27/2011 through today, 07/10/2014. The Staff Hearing Officer accepts the Injured Worker's testimony that he used his bank account as a conduit for moving the funds from the Wehinger companies to the people who actually performed the labor. While the Injured Worker may have been helping others find employment on a sporadic and temporary basis with the Wehinger companies, such activity is not found to constitute "work" which would render the Injured Worker ineligible for the payment of compensation.

Therefore, it is the order of the Staff Hearing Officer that the Bureau of Workers' Compensation motion is denied. The Staff Hearing Officer orders the Injured Worker was properly paid permanent total disability compensation from 05/27/2011, through today, 07/10/2014, and there was no overpayment of permanent total disability compensation from 05/27/2011, through today 07/10/2014. Further, it is the order of the Staff Hearing Officer that there is no evidence of fraud during the period the Injured Worker received permanent total disability compensation from 05/27/2011, through today. Finally, it is the order of the Staff Hearing Officer that permanent total disability compensation is to continue to be paid pursuant to the Staff Hearing Officer order, issued 03/29/2012.

{¶ 74} 30. The DHO's order of July 10, 2014 (mailed July 23, 2014) provides an explanation for denial of TTD compensation that is similar to the explanation in the SHO's order of July 10, 2014. The DHO's order of July 10, 2014 will not be quoted here.

{¶ 75} 31. On August 1, 2014, the bureau administratively appealed the DHO's order of July 10, 2014.

{¶ 76} 32. Also on August 1, 2014, the bureau requested reconsideration of the SHO's order of July 10, 2014 that had denied that part of the bureau's motion regarding

No. 15AP-637

PTD compensation. In its memorandum in support of reconsideration, the bureau, through staff counsel, argued that the SHO's order contained both a clear mistake of fact and a clear mistake of law:

### Mistake of Fact

The Staff Hearing Officer in the July 10, 2014 order made a clear mistake of fact. The Staff Hearing Officer states "The injured worker testified that he did not perform any physical work and did not keep any of the money." Based on the previously noted review of the banking information obtained by BWC's Special Investigations Department, between December 14, 2010 and June 13, 2012, Mr. Pleasant made more than $17,800.00. In addition, 1099's [sic] were issued to Mr. Pleasant from Mr. Wehinger's companies for 2012 totaling $36,505.93.

The Staff Hearing Officer also states "While the injured worker may have been helping others find employment on a sporadic and temporary basis with the Wehinger companies, such activity is not found to constitute "work" which would render the injured worker ineligible for the payment of compensation." Mr. Pleasant's activity is not sporadic or temporary. The records provided by Tonya Adams, the CFO of the Wehinger companies included approximately 260 invoices, requests for reimbursement of purchased supplies and copies of checks. The first was in December of 2008 and the last in October of 2012. (See Attachment 4 of BWC's previously filed motion.)

Because of these clear mistakes of fact and the outcome these mistakes would have had on the findings in the order, the BWC requests the Industrial Commission accept the BWC's request for reconsideration on the issue of clear mistake of fact.

### Mistake of Law

The Staff Hearing Officer made a clear mistake of law by failing to find that Mr. Pleasant committed fraud and intended to deceive the BWC as to his work status. A mistake of law occurs when there is a flawed evaluation of facts resulting in an incorrect legal determination.

Ohio Revised Code section 4123.58 (C) (2) states that permanent total disability should be granted when "[t]he

No. 15AP-637

impairment resulting from the employee's injury or occupational disease prevents the employee from engaging in sustained remunerative employment utilizing the employment skills that the employee has or may reasonably be expected to develop." Mr. Pleasant is capable of and has engaged in sustained remunerative employment while working for the Wehinger companies. Mr. Pleasant acted as a middle man, accepting work from the Wehinger companies, coordinating work with people he knew, driving various individuals to the work sites, purchasing supplies for the work, accepting payment for the work, and paying the individuals to do the work. There is evidence that Mr. Pleasant made approximately $17,800 in about a year and a half for performing this work. Mr. Pleasant was provided 1099's [sic] from the Wehinger companies. In at least one instance Mr. Pleasant was identified as the individual actually performing the work (See Attachment 3 - Memorandum of Interview with Janise Kowalski). The evidence in the BWC's report of investigation clearly indicates Mr. Pleasant is capable of sustained remunerative employment.

BWC asks that reconsideration be granted based on mistake of law as Mr. Pleasant does not qualify for permanent total disability compensation under Ohio Revised Code section 4123.58 (C) (2).

{¶ 77} 33. On August 26, 2014, the three-member commission, on a two-to-one vote, mailed an interlocutory order stating:

The BWC's Request for Reconsideration filed 08/01/2014, from the Staff Hearing Officer order, issued 07/23/2014, is referred to the Commission Level Hearings Section to be docketed before the Members of the Industrial Commission. The issues to be heard are:
[One] Issue:
[One] Continuing Jurisdiction Pursuant To R.C. 4123.52
[Two] Terminate Permanent Total-Declare PTD Overpayment
[Three] Permanent Total Disability Fraud

It is the finding of the Industrial Commission the Administrator has presented evidence of sufficient probative value to warrant adjudication of the Request for Reconsideration regarding the alleged presence of a clear mistake of fact in the order from which reconsideration is

No. 15AP-637

sought, and a clear mistake of law of such character that remedial action would clearly follow.

Specifically, it is alleged that in denying the Administrator's requests to terminate the payment of permanent total disability compensation and to declare an overpayment of such compensation, along with a finding of fraud on the Injured Worker's part with respect to his receipt of such compensation, the Staff Hearing Officer erred in finding the Injured Worker did not physically perform any of the work activity documented in the Administrator's investigation report. In addition, it is alleged the Staff Hearing Offices erred in finding the Injured Worker's involvement in locating other individuals to perform the work activity in question was sporadic and temporary, given the significant dollar amount of billings related to the work and the volume of documentation, including invoices, reimbursements, and checks relating to the work, as referenced in the investigation report.

Based on these findings, the Industrial Commission directs the Administrator's Request for Reconsideration, filed 08/01/2014, be set for hearing to determine whether the alleged clear mistakes of fact and law as noted herein are sufficient for the Industrial Commission to invoke its continuing jurisdiction.

In the interest of administrative economy and for the convenience of the parties, after the hearing on the question of continuing jurisdiction, the Industrial Commission will take the matter under advisement and proceed to hear the merits of the underlying issue(s). The Industrial Commission will thereafter issue an order on the matter of continuing jurisdiction under R.C. 4123.52. If authority to invoke continuing jurisdiction is found, the Industrial Commission will address the merits of the underlying issue(s).

{¶ 78} 34. As earlier noted, on August 1, 2014, the bureau administratively appealed the DHO's order of July 10, 2014. The administrative appeal was heard on October 24, 2014 by SHO B. Smith. Following the hearing, SHO B. Smith mailed an order on October 31, 2014 that affirmed the DHO's order of July 10, 2014. The October 24, 2014 order of SHO B. Smith explains:

No. 15AP-637

It is the finding of the Staff Hearing Officer that the Bureau of Workers' Compensation has not met its burden of proving that the injured worker was gainfully employed with Environmental Management Services, Inc., Mark Wehinger IV, or Wenger [sic] V Ltd. over the period at issue and, therefore, no grounds for continuing jurisdiction has been shown. Based on this the request to find an overpayment and fraud for the period requested at hearing, 12/30/2008 through 05/26/2011, is denied.

The Bureau of Workers' Compensation representative stated at the hearing that there was no evidence that the injured worker physically did any work activity or did physical activity showing an ability to return to the former job over the period in question and stated they were not making such an argument at this time.

The sole question then becomes whether the Bureau of Workers' Compensation has proven that the injured worker was gainfully employed by Environmental Management Services, Inc., Mark Wehinger, Wehinger IV, or Wenger V Ltd., over the period at issue. It is found that the Bureau of Workers' Compensation has not met it's [sic] burden of proof and the motion is denied.

The Bureau of Workers' Compensation has provided insufficient evidence to show that the injured worker kept any of the moneys [sic] he received from the named alleged employer's [sic]. 1) The injured worker was never given a W-2 or 1099 over the period at issue. Further, Mr. Wehinger testified that his company only gave one to the injured worker in 2012 because the SIU investigators were asking about such and because of this Mr. Wehinger became concerned that he might be doing something wrong if he did not. 2) Mr. Wehinger testified that he was not aware of the injured worker keeping any of the money he received from Mr. Wehinger or his companies. 3) Mr. Grant's affidavit, dated 10/23/2014, states that he performed work on Mr. Wehinger's rental properties. It states that he was told about the jobs by the injured worker and he would look at the job and tell the injured worker what the cost would be. Mr. Grant states that he would do the actual work along with his co-worker's [sic] and that he was always paid the same amount that he quoted for the cost of the job. He concludes that he was not aware of the injured worker keeping any of the money paid for the jobs. 4) The Bureau of Workers'

No. 15AP-637

> Compensation has submitted no statement from anyone that states the injured worker kept any of the money to show that he was not merely a go-between as he alleges

{¶ 79} 35. On November 13, 2014, the bureau administratively appealed the SHO's order of October 24, 2014 that addressed only TTD compensation.

{¶ 80} 36. On December 2, 2014, on a two-to-one vote, the three-member commission mailed an order refusing the bureau's administrative appeal from the SHO's order of October 24, 2014 (mailed October 31, 2014).

{¶ 81} 37. On January 13, 2015, the three-member commission, on a unanimous vote, mailed an interlocutory order that sua sponte exercises continuing jurisdiction over the SHO's order of October 24, 2014. The interlocutory order explains:

> The Commission finds grounds to exercise continuing jurisdiction, sua sponte, based on a probable clear mistake of fact in the Staff Hearing Officer order issued 10/31/2014, and a probable clear mistake of law of such character that remedial action would clearly follow.
>
> On 12/02/2014, an order was issued refusing the Administrator's Appeal, filed 11/13/2014, from the Staff Hearing Officer order, issued 10/31/2014. The Commission finds the Administrator's Appeal, filed 11/13/2014, is closely related to the issues raised in the Administrator's Request for Reconsideration, filed 08/01/2014, from the Staff Hearing Officer order, issued, 7/23/2014, for which the Commission found presented evidence of a clear mistake of fact in the order from which reconsideration is sought, and a clear mistake of law of such character that remedial action would clearly follow, and issued an Interlocutory Order on 8/26/2014, referring the Request for Reconsideration for hearing.
>
> It is arguable the Staff Hearing Officer erred in finding the Injured Worker did not keep any of the money received for the work performed for the alleged employers and in finding the Injured Worker's actions as an alleged "go-between" did not constitute work activities so as to preclude entitlement to temporary total disability compensation.
>
> Therefore, the Commission orders the Refusal Order, issued 12/02/2014, vacated. By unanimous determination, the

No. 15AP-637

> Administrator's Appeal, filed 11/13/2014, from the Staff Hearing Officer order, issued 10/31/2014, is accepted for hearing. The Commission further orders the Administrator's Request for Reconsideration, filed 08/01/2014, and the Administrator's Appeal, filed 11/13/2014, be heard together before the Commission. The parties will be properly notified of the time and place of hearing in compliance with the requirement contained in R.C. 4123.511.

{¶ 82} 38. Following a February 5, 2015 hearing before the three-member commission, the commission issued two orders. One of the orders exercises continuing jurisdiction over the October 24, 2014 order of the SHO that denied that part of the bureau's motion regarding TTD compensation. The other commission order exercises continuing jurisdiction over the July 10, 2014 order of the SHO that denied that part of the bureau's motion regarding PTD compensation.

{¶ 83} 39. The February 5, 2015 commission order that exercises continuing jurisdiction over the SHO's order of October 24, 2014 (mailed October 31, 2014) and grants that portion of the bureau's motion regarding TTD compensation, explains:

> After further review and discussion, it is the decision of the Industrial Commission the order of the Staff Hearing Officer, issued 10/31/2014, is vacated, and the Administrator's Motion, filed 04/07/2014, is granted.
>
> The Commission finds temporary total disability compensation overpaid from 12/30/2008 to 05/26/2011. The Commission further finds the Injured Worker committed fraud and orders the overpayment collected consistent with R.C. 4123.511(K)(4).
>
> The Commission finds the Injured Worker worked while receiving temporary total disability compensation. This finding is supported by the statements from Patti Mortensen dated 07/27/2012, Janise Kowalski dated 09/27/2012, and Tonya Adams dated 11/05/2012; the invoices obtained from Ms. Adams; the Chase Bank records; the Injured Worker's 2012 1099 tax form; and the spread sheet created by BWC Special Agent Norman McCloskey. The Commission further finds insufficient persuasive evidence the Injured Worker hired and paid others to do the work listed on the invoices. The evidence overwhelmingly supports the conclusion the

No. 15AP-637

Injured Worker was working, and his testimony to the contrary is not credible.

Moreover, the Commission finds reliable, probative, and substantial evidence the Injured Worker knowingly used deception to obtain temporary total disability compensation. The prima facie elements of fraud are: 1) a representation, or where there is a duty to disclose, concealment of fact; 2) which is material to the transaction at hand; 3) made falsely, with the knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) with the intent of misleading another into relying upon it; 5) justifiable reliance upon the representation or concealment; and 6) a resulting injury proximately caused by the reliance.

Hundreds of invoices from Mark Wehinger and his companies, beginning 12/30/2008, confirm the Injured Worker's ongoing employment while the Injured Worker received temporary total disability compensation from 12/30/2008 to 05/26/2011. Accordingly, the Commission finds the first element of fraud present, i.e. the Injured Worker concealed from the Administrator that he was working. The second element of fraud was present, i.e., the Injured Worker's concealment was material because his employment would preclude temporary total disability compensation.

The Commission finds sufficient evidence to support the third and fourth elements of fraud, i.e., the statements were made falsely, with the knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and with the intent of misleading another into relying upon it. Specifically, the Injured Worker repeatedly denied employment to medical providers, and he certified on 18 C-84, Request for Temporary Total Compensation, forms that he was not working. However, the Chase Bank records, invoices, and BWC spread sheet not only document years of payment from Mark Wehinger and his companies to the Injured Worker, these records further substantiate the Injured Worker profited from the employment relationship. Additionally, the statements from Janise Kowalski (10/01/2011), Patti Mortensen (10/07/2011), and Tonya Adams (11/05/2012) confirm the Injured Worker performed spot labor and maintenance work. Because the Injured Worker concealed

No. 15AP-637

his ongoing employment, the Commission concludes the Injured Worker intentionally and falsely did so in order to receive compensation.

The fifth element of fraud is met as the Administrator justifiably relied upon the Injured Worker's false allegation that he was disabled. Finally, the sixth element of fraud requires "a resulting injury proximately caused by the reliance"; this element has been established when the Injured Worker was inappropriately awarded temporary total disability compensation.

{¶ 84} 40. The February 5, 2015 commission order that exercises continuing jurisdiction over the SHO's order of July 10, 2014 (mailed July 23, 2014) and grants that portion of the bureau's motion regarding PTD compensation, explains:

After further review and discussion, it is the decision of the Industrial Commission the Administrator has met his burden of proving the Staff Hearing Officer order, issued 07/23/2014, contains a clear mistake of fact from which reconsideration is sought. Specifically, the Staff Hearing Officer erred when she found the Injured Worker did not keep money paid to him from Mark Wehinger or Mr. Wehinger's companies and did not physically perform any of the work activities. With hundreds of invoices and checks addressed to the Injured Worker and no persuasive evidence the Injured Worker paid others to do the work, the Commission finds the Injured Worker was working while receiving permanent total disability compensation. Therefore, the Industrial Commission exercises continuing jurisdiction pursuant to R.C. 4123.52 and State ex rel. Nicholls v. Indus. Comm., 81 Ohio St.3d 454, 692 N.E. 2d 188 (1998), State ex rel. Foster v. Indus. Comm., 85 Ohio St. 3d 320. 707 N.E. 2d 1122 (1999), and State ex rel. Gobich v. Indus. Comm., 103 Ohio St.3d 585, 2004-Ohio-5990, 817 N.E. 2d 398, in order to correct this error.

The Administrator's Request for Reconsideration, filed 08/01/2014, is granted, and the Staff Hearing Officer order, issued 07/23/2014, is vacated.

It is the order of the commission the Administrator's Motion, filed 04/07/2014, is granted. Permanent total disability compensation is terminated as of the date of hearing before the Commission, 02/12/2015, and permanent total disability

No. 15AP-637

compensation is found overpaid from 05/27/2011 to 02/12/2015 The Commission finds the Injured Worker committed fraud and orders the overpayment collected consistent with R.C. 4123.511(K)(4).

The Commission finds the Injured Worker worked while receiving permanent total disability compensation. This finding is supported by the statements from Patti Mortensen dated 07/27/2012, Janice [sic] Kowalski dated 09/27/2012, and Tonya Adams dated 11/05/2012, the invoices obtained from Ms. Adams; the Chase Bank records; the Injured Worker's 2012 1099 tax form; and the spread sheet created by BWC Special Agent Norman McCloskey. The Commission further finds insufficient persuasive evidence the Injured Worker hired and paid others to do the work listed on the invoices. The evidence overwhelmingly supports the conclusion the Injured Worker was working, and his testimony to the contrary is not credible.

Moreover, the Commission finds reliable, probative, and substantial evidence the Injured Worker knowingly used deception to obtain permanent total disability compensation. The prima facie elements of fraud are: 1) a representation, or where there is a duty to disclose, concealment of fact; 2) which is material to the transaction at hand; 3) made falsely, with the knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) with the intent of misleading another into relying upon it; 5) justifiable reliance upon the representation or concealment; and 6) a resulting injury proximately caused by the reliance.

Permanent total disability compensation was awarded by Staff Hearing Officer order issued 03/29/2012, with such compensation beginning 05/27/2011. However, the checks dated 10/01/2011 and 10/07/2011, from Janise Kowalski and Patti Mortensen respectively confirm the Injured Worker received payment for work during the period he alleged he was permanently and totally disabled. The hundreds of invoices, which began on 12/30/2008, also confirm the Injured Worker's ongoing employment for Mark Wehinger. Accordingly, the Commission finds the first element of fraud present, i.e. the Injured Worker concealed from the Staff Hearing Officer at the permanent total disability compensation hearing that he was working. The second element of fraud is present, i.e., the Injured Worker's

concealment was material because his employment status would preclude permanent total disability compensation.

The commission finds sufficient evidence to support the third and fourth elements of fraud, i.e., the statements were made falsely, with the knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and with the intent of misleading another into relying upon it. Specifically, the Injured Worker repeatedly denied employment to medical providers and argued he was not capable of any sustained remunerative employment. However, the Chase Bank records, invoices, and BWC spread sheet not only document years of payment from Mark Wehinger and his companies to the Injured Worker, these records further substantiate the Injured Worker profited from the employment relationship. Additionally, the statements from Janise Kowalski (10/01/2011), Patti Mortensen (10/07/2011), and Tonya Adams (11/05/2012) confirm the Injured Worker performed spot labor and maintenance work. Because the Injured Worker concealed his ongoing employment, the Commission concludes the Injured Worker intentionally and falsely did so in order to receive compensation.

The fifth element of fraud is met as the Staff Hearing Officer justifiably relied upon the Injured Worker's false allegation that he was permanently and totally disabled. Finally, the sixth element of fraud requires "a resulting injury proximately caused by the reliance"; this element has been established when the Injured Worker was inappropriately awarded permanent total disability compensation.

{¶ 85} 41. On July 2, 2015, relator, Keith Pleasant, filed this mandamus action.

<u>Conclusions of Law</u>:

{¶ 86} Two issues are presented: (1) did the commission abuse its discretion in exercising its continuing jurisdiction over the SHO's order of July 10, 2014 that denied that part of the bureau's motion regarding PTD compensation, and (2) did the commission abuse its discretion in exercising continuing jurisdiction over the SHO's order of October 24, 2014 that denied that part of the bureau's motion regarding TTD compensation?

{¶ 87} Finding that the commission did not abuse its discretion over either part of the bureau's motion, it, therefore, is the magistrate's decision that this court deny relator's request for a writ of mandamus.

## PTD Basic Law

{¶ 88} PTD is defined as the inability to perform sustained remunerative employment. *State ex rel. Stephenson v. Indus. Comm.*, 31 Ohio St.3d 167 (1987).

{¶ 89} In *State ex rel. Lawson v. Mondie Forge*, 104 Ohio St.3d 39, 2004-Ohio-6086, the Supreme Court of Ohio set forth three separate criteria for the termination of PTD compensation based on prior case law. Payment of PTD compensation is inappropriate where there is evidence of (1) actual sustained remunerative employment (*State ex rel. Kirby v. Indus. Comm.*, 97 Ohio St.3d 427, 2002-Ohio-6668); (2) the physical ability to do sustained remunerative employment (*State ex. rel. Schultz v. Indus. Comm.*, 96 Ohio St.3d 27, 2002-Ohio-3316); or (3) activities so medically inconsistent with the disability that they impeach the medical evidence underlying the award. *See State ex rel. Timmerman Truss, Inc. v. Indus. Comm.*, 102 Ohio St.3d 244, 2004-Ohio-2589; *Lawson* at ¶ 41.

{¶ 90} "*Schultz* * * * teaches that unpaid activity that is potentially remunerative can be considered for purposes of establishing a physical capacity for remunerative employment." *Lawson* at ¶ 42.

## TTD Basic Law

{¶ 91} Temporary total disability is the inability to return to the former position of employment. *State ex rel. Ramirez v. Indus. Comm.*, 69 Ohio St.2d 630 (1982). TTD compensation is prohibited to one who has returned to work. R.C. 4123.56(A).

{¶ 92} Activities medically inconsistent with the inability to return to the former position of employment bar TTD compensation regardless of whether the claimant is paid. *State ex rel. Ford Motor Co. v. Indus. Comm.*, 98 Ohio St.3d 20, 2002-Ohio-7038, ¶ 23, citing *State ex rel. Parma Community Gen. Hosp. v. Jankowski*, 95 Ohio St.3d 340, 2002-Ohio-2336. Activities that are not medically inconsistent, however, bar TTD compensation only when a claimant is remunerated for them. *Id.* Moreover, even sporadic employment can bar TTD compensation. *Ford* at 23, citing *State ex rel. Blabac v. Indus. Comm.*, 87 Ohio St.3d 113 (1999).

No. 15AP-637

{¶ 93} Activities that are not minimal and that directly generate income for a separate entity may be considered work and may disqualify a claimant from receiving TTD compensation even when the claimant is not paid. *State ex rel. McBee v. Indus. Comm.,* 132 Ohio St.3d 209, 2012-Ohio-2678, ¶ 7. (Claimant helped his wife with her business, but he was not paid for his services.)

### Continuing Jurisdiction

{¶ 94} Continuing jurisdiction is not unlimited. Its prerequisites are (1) new and changed circumstances, (2) fraud, (3) clear mistake of fact, (4) clear mistake of law, or (5) error by an inferior tribunal. *State ex rel. Royal v. Indus. Comm.*, 95 Ohio St.3d 97 (2002).

{¶ 95} The presence of one of these prerequisites must be clearly articulated in any commission order seeking to exercise reconsideration jurisdiction, i.e., continuing jurisdiction. *State ex rel. Gobich v. Indus. Comm.*, 103 Ohio St.3d 585, 2004-Ohio-5990, ¶ 15. This means that the prerequisite must be both identified and explained. *Id.*

{¶ 96} In *Royal,* the commission had awarded Gerald Royal PTD compensation. Thereafter, the employer timely sought reconsideration. After initially denying the motion, the commission granted reconsideration. Pertinent here is the court's discussion of mistake of fact:

> The reliance on "mistake of fact" is equally untenable. When the initial PTD order and disputed reports are read closely, the perceived error is not so much mistake as a difference in evidentiary interpretation. The report of vocational consultant Roger Livingston is confusing and can be interpreted several ways. The commission and appellant-employer took the narrow interpretation, looking exclusively at the academic and vocational conclusions. The SHO, on the other hand, read these things in conjunction with the unfavorable medical prognosis that Livingston repeatedly stressed, and concluded that regardless of an affirmative vocational profile, claimant could not overcome the obstacles imposed by the loss of his right arm.
>
> This is significant because a legitimate disagreement as to the evidentiary interpretation does not mean that one of the interpretations is wrong. Thus, any assertion of a clear error of fact is questionable.

No. 15AP-637

*Id.* at 100.

{¶ 97} Here, relator places reliance upon *Gobich.* Accordingly, that case merits review.

{¶ 98} John F. Gobich was awarded PTD compensation in 1998. It was made retroactive to July 1996. In 2002, the bureau alleged that Gobich had worked during this period and moved to have PTD benefits terminated, an overpayment assessed, and fraud declared.

{¶ 99} The evidence showed that before being declared permanently and totally disabled, Gobich had done a couple of odd jobs in 1996 and 1997. These jobs became problematic when the commission back-dated the PTD award over this period. There was also evidence that Gobich had worked four hours for a total of $120 in January 1997 and he was paid $350.63 for an odd job in early 1998, both jobs again preceding Gobich's notification that he had been awarded PTD compensation.

{¶ 100} A commission SHO denied the bureau's motion. In his order, the SHO noted Gobich's hearing testimony that he had performed odd jobs for a friend/business owner earning $855 in 1996 and $960 in 1997. The SHO determined that the performance of odd jobs does not demonstrate that Gobich is able to perform sustained remunerative employment despite his limitations due to his allowed conditions in his claims.

{¶ 101} The bureau moved for reconsideration.

{¶ 102} In October 2002, the commission found that it had continuing jurisdiction to reconsider PTD based on what it called "clear mistakes of law." *Id.* at ¶ 11. The commission explained that the SHO "failed to consider the fact that the injured worker was working immediately prior to, and after, the hearing on 01/22/1998." *Id.*

> In issuing the writ, the *Gobich* court explained:
>
> Two questions arise from this reasoning: (1) Was there a mistake? (2) If so, was it clear? On close examination, it appears that, regardless of how the bureau tried to characterize it, its complaint with the SHO's order was really an evidentiary one: the bureau produced evidence that it believed established a capacity for sustained remunerative employment, and the SHO found otherwise, *Royal,* however,

No. 15AP-637

> has specifically stated that a legitimate disagreement as to evidentiary interpretation does not mean that one of them was
>
> mistaken and does not, at a minimum, establish that an error was clear. *Id.,* 95 Ohio St.3d at 100, 766 N.E.2d 135.

*Id.* at ¶ 17.

### First Issue

{¶ 103} Analysis begins with scrutiny of the SHO's order of July 10, 2014 that denied that part of the bureau's motion regarding PTD compensation.

{¶ 104} The SHO accepts relator's testimony that he kept none of the money that he handled when he paid workers for work they performed for Wehinger and his companies. The SHO accepts relator's testimony notwithstanding the substantial amount of documents that strongly suggest otherwise. The SHO also accepts relator's testimony that he performed none of the physical labor that Wehinger paid to be performed.

{¶ 105} Under *Schultz,* PTD compensation is inappropriate when it is shown that the PTD claimant has the physical ability to do sustained remunerative employment even though the claimant has not been paid for the activities that show a physical ability to do sustained remunerative employment.

{¶ 106} Given the SHO's determination that relator kept none of the money that he allegedly disbursed to the workers that he recruited for the Wehinger jobs, the *Schultz* situation was therefore before the SHO. That is, relator's activities as the intermediary between Wehinger and the workers who performed jobs for Wehinger demanded a determination from the SHO as to whether those potentially remunerative activities show a physical ability to perform sustained remunerative employment as a manager for Wehinger. One would normally expect some type of payment for those types of activities.

{¶ 107} While the SHO's order of July 10, 2014 does not cite to *Schultz,* the SHO seems to have had the *Schultz* scenario in mind when the SHO states:

> While the Injured Worker may have been helping others find employment on a sporadic and temporary basis with the Wehinger companies, such activity is not found to constitute "work" which would render the Injured Worker ineligible for the payment of compensation.

No. 15AP-637

{¶ 108} In its interlocutory order mailed August 26, 2014, the three-member commission invoked the prerequisites of clear mistake of law and clear mistake of fact. After identifying the two prerequisites for the exercise of continuing jurisdiction, the commission's interlocutory order explains:

> [T]he Staff Hearing Officer erred in finding the Injured Worker did not physically perform any of the work activity documented in the Administrator's investigation report. In addition, it is alleged the Staff Hearing Officer erred in finding the Injured Worker's involvement in locating other individuals to perform the work activity in question was sporadic and temporary, given the significant dollar amount of billings related to the work and the volume of documentation, including invoices, reimbursements, and checks relating to the work, as referenced in the investigation report.

{¶ 109} In its February 5, 2015 order, the commission invokes clear mistake of fact. Clear mistake of law is not mentioned. In pertinent part, the commission order explains:

> [T]he Administrator has met his burden of proving the Staff Hearing Officer order, issued 07/23/2014, contains a clear mistake of fact from which reconsideration is sought. Specifically, the Staff Hearing Officer erred when she found the Injured Worker did not keep money paid to him from Mark Wehinger or Mr. Wehinger's companies and did not physically perform any of the work activities. With hundreds of invoices and checks addressed to the Injured Worker and no persuasive evidence the Injured Worker paid others to do the work, the Commission finds the Injured Worker was working while receiving permanent total disability compensation. Therefore, the Industrial Commission exercises continuing jurisdiction.

{¶ 110} Thus, the interlocutory order identifies and explains that the SHO's order "erred in finding the Injured Worker did not physically perform any of the work activity documented in the Administrator's investigation report." The interlocutory order refers to the "volume of documentation."

{¶ 111} The February 5, 2015 commission order identifies and explains that the SHO's order "contains a clear mistake of fact" which is that the SHO erred when she

found that relator "did not physically perform any of the work activities." The February 5, 2015 commission order declares a clear mistake of fact because the SHO's finding is counter to the "hundreds of invoices and checks addressed to the Injured Worker and no persuasive evidence the Injured Worker paid others to do the work."

{¶ 112} Both the interlocutory order and the commission's February 5, 2015 order refer to the volume of documentation supporting a finding that relator himself physically performed much of the work documented by the invoices and checks.

{¶ 113} According to relator, there is no mistake of fact. Citing to *Royal* and *Gobich,* relator argues that there is merely an evidentiary disagreement between the SHO and the commission.

{¶ 114} The magistrate disagrees that *Royal* and *Gobich* require this court to view the commission's holding as merely a legitimate disagreement as to evidentiary interpretation. In the view of this magistrate, the documentary evidence submitted in the SIU report is so overwhelming that it was unreasonable for the SHO to reject it in favor of relator's testimony. This is particularly so because relator never disputed the documentation. What relator did was to weave an explanation that simply invites the reviewer to ignore common sense.

{¶ 115} In short, this is not the case of two reasonable interpretations of the evidence that can be described as a legitimate disagreement. Thus, the magistrate concludes that the SHO's order of July 10, 2014 indeed contains a clear mistake of fact on which the commission appropriately based the exercise of its continuing jurisdiction.

## Second Issue

{¶ 116} Analysis begins with scrutiny of the SHO's order of October 24, 2014 that denied that part of the bureau's motion regarding TTD compensation.

In his order, the SHO found that relator kept none of the money that he handled when he allegedly paid workers for work they performed for Wehinger and his companies.

{¶ 117} In his order, the SHO finds that the bureau "has provided insufficient evidence to show that the injured worker kept any of the moneys [sic] he received from the named alleged employer's [sic]." In support of this finding, the SHO relied on the affidavit of Steven Grant, Sr., executed October 23, 2014, the day prior to the October 24,

No. 15AP-637

2014 hearing before the SHO.  (As earlier noted, Agent McCloskey conducted a telephone interview of Grant on August 9, 2013 and the interview is summarized by McCloskey in the SIU report.)

> The Grant affidavit avers:
>
> [One]  I know Keith Pleasant;
> [Two] I have performed worked for rental properties owned by Mark Wehinger and his companies;
>
> [Three] I would obtain information regarding these jobs from Keith Pleasant;
>
> [Four] I would then look at what the job entailed and tell Keith Pleasant what the costs would be and Keith Pleasant would then submit the information to Mark Wehinger;
>
> [Five] I was paid in cash almost always for the work performed at the actual costs that I had quoted to Keith Pleasant.
>
> [Six]   I never observed Keith Pleasant perform any physical labor on these job sites;
>
> [Seven] There were other people who performed the work and worked with me if I needed help;
>
> [Eight] In the neighborhood where these properties are located, the economy is very bad, with a high unemployment rate especially for African Americans. Most of the people who worked on these jobs with me were unemployed and had nothing to do. Further, most of the people who worked with me did not have bank accounts in order to cash checks;
>
> [Nine] I observed Keith Pleasant pay the money given to him by Mark Wehinger to the workers' [sic] who did the work, in cash;
>
> [Ten] I was always paid the same amount that I had quoted to Keith and I am unaware that Keith ever kept any of the money paid by Mark Wehinger and his companies to perform the work.

{¶ 118}  The SHO's finding regarding an alleged lack of remuneration was also based on testimony of Wehinger who testified that he was not aware that relator had kept any of the money he received from Wehinger or his companies.

{¶ 119}  As noted by the court in *Ford,* activities that are not medically inconsistent with the inability to return to the former position of employment bar TTD compensation only when a claimant is remunerated for them.

{¶ 120}  Thus, the SHO's order of October 24, 2014 is focused on the remuneration issue.  At the hearing, the bureau did not allege that any of relator's physical activities demonstrated an ability to return to the former position of employment.  Accordingly, the remuneration issue became dispositive as to whether TTD compensation was appropriate.

{¶ 121}  In short, the SHO stated reliance on three items of evidence in determining that relator was not remunerated for his activities:  (1) the hearing testimony of Wehinger, (2) the affidavit of Grant, and (3) the absence of any statement from anyone that relator kept any of the money.

{¶ 122}  As earlier noted, on January 13, 2015, the three-member commission sua sponte issued an interlocutory order that put relator on notice that the commission intended to consider the exercise of its continuing jurisdiction over the October 24, 2014 order of the SHO that denied that part of the bureau's order regarding TTD compensation.

{¶ 123}  Invoking both a clear mistake of fact and a clear mistake of law, the interlocutory order explains:

> It is arguable the Staff Hearing Officer erred in finding the Injured Worker did not keep any of the money received for the work performed for the alleged employers and in finding the Injured Worker's actions as an alleged "go-between" did not constitute work activities so as to preclude entitlement to temporary total disability compensation.

{¶ 124}  Unlike the February 5, 2015 commission order that addressed PTD compensation, the February 5, 2015 commission order addressing TTD compensation does not directly assert a clear mistake of fact or a clear mistake of law.  However, the SHO does state that "[t]he evidence overwhelmingly supports the conclusion the Injured Worker was working, and his testimony to the contrary is not credible."

{¶ 125}   Significantly, in that portion of the commission's order addressing fraud, the commission finds:

> [T]he Chase Bank records, invoices, and BWC spread sheet not only document years of payment from Mark Wehinger and his companies to the Injured Worker, these records further substantiate the Injured Worker profited from the employment relationship.

{¶ 126}   Thus, the commission's order of February 5, 2015 finds that relator was paid or remunerated for his activities in obtaining the workers to perform the Wehinger jobs.

{¶ 127}   While the commission's order of February 5, 2015 does not directly assert a clear mistake of fact as the other commission's order of February 5, 2015 does, it is nevertheless clear that the documentary evidence submitted in the SIU report is so overwhelming that it was unreasonable for the SHO to reject it in favor of the statements of Wehinger and Grant.

{¶ 128}   Thus, the magistrate concludes that the commission's order of February 5, 2015 regarding TTD compensation appropriately exercised continuing jurisdiction.

{¶ 129}   Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

> Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).

No. 15AP-637